IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF Virginia
Richmond Division

| | |
|---|---|
| MARCI J. KEATTS<br><br>       Plaintiff,<br><br>v.<br><br>LECLAIRRYAN, PLLC (formerly LECLAIRRYAN, a Professional Corporation), and ULX PARTNERS, LLC<br><br>       Defendants | Civil Action No: 3:19-cv-535 |

## COMPLAINT

COMES NOW Plaintiff Marci J. Keatts, by counsel, and states the following as her Complaint against Defendants LeClairRyan, PLLC (formerly LeClairRyan, a Professional Corporation) and ULX Partners, LLC:

### NATURE OF THE ACTION

1. This is an action for gender based employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*, as amended, including the Lilly Ledbetter Fair Pay Act of 2009, and the Equal Pay Act, 29 U.S.C. § 206(d), *et seq*.

2. While employed by LeClairRyan PLLC (then doing business as LeClairRyan, a Professional Corporation) in its Marketing Communications department, Plaintiff Marci J. Keatts ("Plaintiff" or "Keatts") was discriminated against in terms, conditions and privileges of her employment on the basis of her gender, resulting from a broader discriminatory compensation scheme in place at the Firm. Plaintiff opposed the discriminatory pay internally and filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC).

Rather than correct the pay disparity, Plaintiff and other staff were "rebadged" to Defendant ULX Partners, LLC ("ULX Partners") which continued to implement the discriminatory pay scheme. Plaintiff resigned her LeClairRyan/ULX Partners employment due to Defendant's refusal to compensate at the level of her subordinate male in accordance with the law.

3. Plaintiff seeks declaratory and injunctive relief, compensatory and exemplary damages against both Defendants for employment discrimination on the basis of her gender, in violation of Title VII to the 1964 Civil Rights Act, as amended, 42 U.S.C. §§2000e *et seq*. ("Title VII"), including the Lilly Ledbetter Fair Pay Act of 2009, and for wage damages and liquidated damages for violations of the Equal Pay Act, 29 U.S.C. §206(d) ("EPA"), as well as a third year of wage and liquidated damages for willful violations of the EPA.

**JURISDICTION AND VENUE**

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1343 and 42 U.S.C. §2000(e)-(5)(f), 29 U.S.C. §206(d). The declaratory and injunctive relief sought is authorized by 28 U.S.C. Sections 2201 and 2202, 42 U.S.C. §2000e *et seq*., 29 U.S.C. § 217 and Rule 57 of the Federal Rules of Civil Procedure.

5. Venue is proper in this District under 28 U.S.C. §1391(b) and (e) and 42 U.S.C. §2000(e)-(5)(f)(3) as the actions and unlawful employment practices alleged herein were committed in the Eastern District of Virginia.

6. Plaintiff has exhausted all required administrative procedures for the filing of her Title VII action, having filed a timely formal charges with the Equal Employment Opportunity Commission against LeClairRyan on or about April 5, 2018 (Charge No. 438-2-18-00910), which was amended on or about May 14, 2018 and against ULX Partners on May 14, 2018 (Charge No. 438-2018-01128). The EEOC issued Notices of Right to Sue on each of the charges

by letters of June 27, 2019.  Suit has been brought within 90 days of Plaintiff's receipt of the Notices of Right to Sue, consistent with Title VII of the Civil Rights Act of 1964, as amended.  No administrative exhaustion is required for the EPA claims.

## PARTIES

7.   Plaintiff, Marci J. Keatts, is a citizen of the Commonwealth of Virginia and a resident of Chesterfield, Virginia.

8.   Defendant LeClairRyan, PLLC is an "employer" within the definitions of Title VII to the 1964 Civil Rights Act and the EPA and is an "enterprise" subject to the EPA.  It may be served with process by its registered agent for service of process, Dwight F. Hopewell, Esquire, 919 E. Main Street, 24th Floor, Richmond, Virginia 23219.

9.   Defendant ULX Partners, LLC is a partnership of LeClairRyan and UnitedLex, an international services provider, designed to partner with law firms to provide "non-core" operations, including legal support, human resources, IT, procurement and finance issues.  ULX Partners is an "employer" within the definitions of Title VII to the 1964 Civil Rights Act and the EPA and is additionally an "enterprise" subject to the EPA.  ULX Partners is a Delaware LLC authorized to do business in Virginia and may be served with process by its registered agent for service, Corporate Creations Network, Inc., 6802 Paragon Place, Suite 410, Richmond, Virginia, 23230.

10.   During all times pertinent hereto, LeClair Ryan employed over 500 employees and ULX Partners employed in excess of 400 employees. In the alternative, as joint employers, LeClairRyan and ULX Partners have employed between 500 and 1000, or more, employees.

11. Keatts was an "employee" subject to the protections of Title VII and the EPA, both in her employment by LeClair Ryan and by ULX Partners, or alternatively, as an "employee" of the joint LeClairRyan/ULX Partners employer organization.

## FACTS

12. LeClairRyan is a national law firm with 25 offices nationwide. Between 2003 and early 2019, the Firm has employed between 378 and 190 attorneys and approximately 300 non-lawyer staff. During this time, the National Law Journal listed the Firm as between the 128th and, in 2019, the 155th largest firm in the United States. The Firm's website presently lists 21 offices in 11 states and the District of Columbia and 190 attorneys.

13. Keatts was employed by LeClairRyan from August, 2010 until May, 2018, shortly after LeClairRyan "rebadged" 300 administrative and legal support employee staff to ULX Partners. She was briefly employed by ULX Partners.

### Background of Historic Gender Pay Practices at the Firm

14. The Firm's governance has historically been controlled by male executive leadership which has consistently compensated its male employees more favorably than its female employees.

15. On information and belief, LeClairRyan monitors its compensation on an annual basis and has knowingly perpetuated its practice of favoring male employees in compensation decisions.

16. Female employees have been reluctant to complain about the discriminatory treatment because of fear of repercussions. Those who question senior management have not lasted long at the Firm.

17. LeClairRyan has a demonstrated history of gender-based pay discrimination toward its female employees. In the arbitration ordered in *Craddock v. LeClairRyan,* Civil Action No. 3:16-cv-11, and with respect to the Firm's compensation paid to female attorneys, the AAA Arbitration Panel unanimously held that:

> On the face of it, the Firm's culture appears propitious for the employment and success of women lawyers… However, notwithstanding this culture, the application of the Firm's compensation policy has had a demonstrable disparate impact on women lawyers. The Firm's gross compensation data produced in this matter shows that for the years 2005-2016 the highest paid female shareholder each year was paid significantly less than the highest paid male shareholder each year… Excerpted LeClairRyan production data from October 2011… when compared with the 2012 total compensation data demonstrates that female shareholders with equal or better 2011 production numbers were paid less total compensation in the following 2012 years, than male shareholders with no better, or lesser, production. Review of the compensation paid to Craddock's two male peers in her 2013 entering shareholder class…demonstrates that they were compensated more than Craddock…. On this record, we conclude, that, had the Firm followed its compensation policy, Craddock would have received a substantial raise in 2014 and that her 2014 salary is the result of intentional discrimination based on gender. (In response to LeClairRyan's asserted defenses) (w)e conclude that Craddock's evidence has met that burden and establishes that the Firm's articulated "non-gender" reason for Craddock's (2014 pay) are a pretext for gender discrimination… We also find that Craddock… suffered emotional distress as a result of the intentional gender discrimination she experienced in her employment in 2014… Accordingly, from the evidence regarding the way the Firm applied the compensation policy in Craddock's case, when viewed in the context of the long-established disparate impact Craddock presented in her prima facie case, it is reasonable to infer intentional gender discrimination in the Firm's determination of her 2014 compensation. *LeClairRyan v. Craddock*; AAA Case No. 01-15-0005-9561; Revised Final Award of Arbitration Panel at pp. 14-16, 21-22 (October 16, 2018) [Hon. R. Annunziata (Ret.), L.R. Singer, Hon. F. B. Stillman (Ret.)] [remanded to Panel by Order of June 11, 2019 (Payne, J.) for correction of mathematical calculations and panel reconsideration of that portion of the award ordering the payment of enhanced attorneys' fees.]

18. Prior to Ms. Craddock's 2015 EEOC charge of gender-based pay discrimination, few female LeClairRyan employees had been elevated to managerial and leadership positions. Vestiges of the historic gender based discrimination have remained in the LeClairRyan compensation system for both female attorneys and non-attorney staff.

19. On information and belief, the Firm's annual compensation decisions for all employees, attorneys and non-attorney staff alike, were considered and approved by the LeClairRyan Board of Directors on the recommendations of its management and board committees.

### Plaintiff's Disparate Pay in her Marketing Communications Roles

20. Plaintiff was employed by LeClairRyan as a Marketing Communications Coordinator from August, 2010 to January 1, 2018. In January, 2018, she was promoted to Marketing Communications Manager, a position she held until May 25, 2018. (Plaintiff also served as "acting manager" of the Marketing Communications Department, functionally fulfilling that role for a full year before she was promoted.)

21. While a Marketing Communications Coordinator, Plaintiff learned from her (acting) Director, Christina Llames, that she was being paid significantly less than a male employee in her department who had less tenure at the Firm than Plaintiff. Brent Chargois, a male peer in the marketing department hired in February, 2016, was being paid $62,000 as a Proposal Coordinator. Plaintiff was paid $48,000 as a Coordinator, $17,000 less than the male peer. The $17,000 differential was 29% of her salary.

### Plaintiff's Opposition to the Pay Disparities

22. Plaintiff objected to the pay disparity through her Director. LeClairRyan took no action to correct the pay disparity. On information and belief, the Firm also initiated no investigation of the pay disparity, contrary to stated Firm policy concerning discrimination matters.

23. In January, 2017, Plaintiff was made "acting" Manager of the Marketing Communications Department. Her pay was not increased and she was still paid $48,000, $17,000 less than the male peer she now supervised.

24. In January, 2018, Plaintiff was promoted to Marketing Communications Manager. Her salary was increased from $48,000 to just shy of $55,000 ($54,999.88). The male employee, still her subordinate in the department, continued to be paid $62,000, $7,000 more than Plaintiff was paid as his manager. The $7,000 pay differential was 12.7% of her salary.

25. Plaintiff again protested the pay disparity to her Director. Her Director informed her that she had advanced Plaintiff's request and the pay disparity to Jennifer Mistal-Kashinegad, the LeClairRyan Chief Administrative Officer with responsibility over staff compensation, but that a higher salary was rejected. Ms. Llames told Keatts that this "was not the time" to push for title or pay changes. No reason was given for the existing pay disparities.

26. From informal discussions with other female employees, it appeared to Keatts that other female administrative staff employees were being paid less than male administrative staff and she was not the only female manager paid less than their male counterparts - and, in her case, less than a male subordinate who she directly supervised – even approving her subordinate's work time sheets.

27. On information and belief, LeClairRyan paid no male manager less than any female subordinates supervised by male managers.

28. Plaintiff observed that, just as she had been placed in an "acting" role for a year, other female managers were kept in "acting" roles for extended periods of time - and paid at the lesser role's rate rather than the rate paid to male managers for the performance of comparable

duties, even for comparable timeframes. This practice had an adverse effect on the compensation paid to female LeClairRyan managers.

29. Plaintiff also learned that, during this time, her own "acting" director, a female, had served in an "acting" role for as long as a year without a pay increase corresponding to her duties or the compensation paid to male directors in that, or similar, roles.

30. On information and belief, male employees' compensation was not depressed in this fashion.

31. Keatts continued to express her concerns to her acting director, including the gender based pay disparities generally, the practice of limiting females pay by labeling the roles as "acting," and her own specific disparity in pay as compared to her male (non-manager) departmental subordinate.

32. On April 7, 2018 Plaintiff filed a Charge of (gender-based) Discrimination against LeClairRyan.

### LeClairRyan "Rebadges" 300 Employees, Including Plaintiff But Continuing the Discriminatory Pay Disparity

33. On April 19, 2018, Plaintiff received an "offer" letter from ULX Partners to continue her LeClairRyan employment as a ULX Partners employee at the same compensation she had received, perpetuating the gender-based pay discrimination she had suffered at LeClair Ryan.

34. Shortly later, LeClairRyan publicly announced that it was moving ("rebadging") its administrative and legal support employees to ULX Partners, who would then be "leased back" to LeClairRyan. Reportedly, 300 LeClairRyan employees were administratively moved to ULX Partners as part of the "rebadging."

35. On information and belief, the subordinate male marketing employee was (again) offered, and paid, the same higher pay as a "ULX Partners employee" or joint LeClairRyan/ULX Partners employee, that is, at least some $7,000 more per year than Plaintiff was paid.

36. As it was explained to Plaintiff, her job duties would remain the same under ULX Partners. She would continue to work at the same location, performing the same types of functions for LeClairRyan that she had performed as a LeClairRyan employee. She would retain her LeClairRyan seniority for annual and paid leave purposes and could retain her LeClairRyan benefits through the end of 2018 as a "full-time transferring employee."

37. As such, under this joint control, LeClairRyan and ULX Partners were to become joint employers of administrative staff such as Plaintiff who would continue to do the same work, but ostensibly under a different employment relationship. Indeed, that is the structure anticipated by the "rebadging" arrangement for the administrative 'transfer' of employees who, functionally, remained working at LeClairRyan.

38. Jennifer Mistal-Kashinegad, the LeClairRyan Chief Administrative Officer became the Chief Administrative Officer at ULX Partners.

39. Ms. Mistal-Kashinegad and, as such, LeClairRyan and ULX Partners, knew that the discriminatory compensation scheme at LeClairRyan would be continued at LeClairRyan/ULX Partners.

40. On information and belief, the ULX Partners "offer" of employment was knowingly, and intentionally, made at a compensation level that Plaintiff had previously pointed out was below her male subordinates' compensation.

41. On information and belief, Defendants' actions were in willful, and/or conscious, disregard of the applicable laws prohibiting gender discriminatory pay practices.

42. Plaintiff accepted the ULX Partner position on or about May 10, 2018 but, due to LeClairRyan's refusal to address the discriminatory pay, had begun to look for other employment.

43. On the afternoon of May 10, Plaintiff was summoned to speak with the senior director of HR for LeClairRyan, Shellie Smith. Plaintiff made clear to Ms. Smith that the decision regarding her compensation had come from Ms. Mistal-Kashinegad, or higher, in the LeClairRyan organization and that, moreover, she then supervised a subordinate male employee who, since his hire, had been making more than her. Additionally, Plaintiff pointed out that the new (male) employee brought in to replace her was hired within $1,000 of what she was making – a fair salary for him, but further demonstrating, with her experience, how underpaid she had been in her role as Marketing Communications Coordinator. She pointed out that the Firm would pay "market" rate for males, but not females, and asked Ms. Smith to do a salary survey to demonstrate how far under market the Firm was compensating her.

44. Plaintiff filed an Amended EEOC Charge against LeClairRyan, and a separate Charge of Discrimination against ULX Partners, on May 14, 2018.

45. The next day, Ms. Smith shared with Plaintiff that her research showed that the salary range for her present position was $61,000 - $116,000, with a median salary of $71,000. Plaintiff's research showed a median salary of at least $77,500 for her position. Clearly, Plaintiff had been underpaid by as much as $20,000, or more, annually.

46. Placed in the position of continuing under a known scheme of gender based pay discrimination, Plaintiff had no choice but to resign her LeClairRyan/ULX Partners employment on May 18, 2018, effective May 25, 2018. This was not a voluntary decision on Plaintiff's part,

but the result of Defendants' insistence on continuing a discriminatory pay practice toward Plaintiff as reflected in the compensation associated with the "offer" for continued employment.

**Damages Suffered by Plaintiff**

47. Plaintiff has suffered damages as a result of LeClairRyan's ongoing discriminatory pay practices and in the LeClairRyan's "rebadging" her at the unlawfully depressed compensation level it had initiated. She has been damaged by her selectively negative, and adverse, treatment in pay through the Firm's refusal to compensate her at the rate of comparably situated male employees. She has been damaged by the adverse impact of the Firm's compensation policies toward female employees, generally, and her specifically. And, she has additionally suffered emotionally, professionally, and in other terms and conditions of her employment as a result of the Firm's, and ULX Partners' gender based pay practices.

48. Plaintiff has suffered damages as a result of ULX Partners' discriminatory pay practices. She has been damaged in ULX Partner's acquiescence, adoption and ratification of the afore-referenced LeClairRyan pay practices furthered in ULX Partners' offers to "rebadge" female employees who continued to work at LeClairRyan, under the direction of LeClairRyan attorneys and senior management, at lesser pay than comparably situated male employees.

49. The longstanding gender discriminatory pay practices implemented by LeClairRyan – as found in the above cited litigation – and furthered at ULX Partners, are systemic and ongoing, dating back to at least Plaintiff's 2010 hire with the Firm. Such practices have negatively affected the pay of many female staff members, administrative personnel and paralegals through the years.

## COUNT ONE
### Title VII, 42 U.S.C. § 2000e, *et seq*. as amended, including the Lilly Ledbetter Fair Pay Act
### Gender-Based Discrimination
### (LeClairRyan and ULX Partners)

50. Plaintiff incorporates by reference, and realleges, the preceding paragraphs as though set forth fully herein.

51. LeClairRyan, by and through the actions of its agents and representatives, which the Firm ratified and condoned, and in the Firm's continued failures to act lawfully, and ULX Partners, discriminated against Plaintiff in the terms, conditions and privileges of her employment on the basis of her gender, including compensation, in violation of 42 U.S.C. § 2000e-2(a). Defendants have denied Plaintiff the rights guaranteed to her pursuant to 42 U.S.C. § 2000e, *et seq*., as amended by the Civil Rights Act of 1991, and further amended by the Lilly Ledbetter Fair Pay Act of 2009.

52. Each discriminatory paycheck issued by LeClairRyan to Plaintiff under the above referenced policy or practice of discriminatory gender-based pay was a separate, on-going violation of Title VII to the 19634 Civil Rights Act, as amended by the Civil Rights Act of 1991, and further amended by the Lilly Ledbetter Fair Pay Act of 2009.

53. By offering "re-employment" at ULX Partners under the same discriminatory pay scheme, LeClairRyan and/or ULX Partners violated 42 U.S.C. § 2000e, *et seq.*, as amended by the Civil Rights Act of 1991, on the basis of her gender.

54. As a consequence of LeClairRyan's, and of ULX Partners', discrimination, Plaintiff has suffered, continues to suffer and will in the future suffer emotional distress, anxiety, stress, embarrassment, humiliation, pain, and suffering.

55. As a consequence of LeClairRyan's, and of ULX Partners', actions, Plaintiff has suffered economic losses, including lost wages and other financial incidents and benefits of employment, and will continue to suffer such losses.

56. As a consequence of the acts and omissions of LeClairRyan and of ULX Partners, Plaintiff has incurred and will continue to incur attorneys' fees, costs and other incidental expenses.

57. Defendants' actions were willful or in conscious disregard of the law subjecting them to punitive damages pursuant to 42 U.S.C. § 2000e, *et seq.*, as amended by the Civil Rights Act of 1991.

**COUNT TWO**
**Equal Pay Act, 29 U.S.C. §§ 206(d),** *et seq.*
**Gender-Based Pay Disparities**
**(LeClairRyan and ULX Partners)**

58. Plaintiff incorporates by reference, and realleges, the preceding paragraphs as though set forth fully herein.

59. Although Plaintiff's job required substantially equal skill, effort and responsibility as her male peer's (and later, her male subordinate's) marketing position, LeClairRyan compensated Plaintiff far less than her male peer.

60. When Plaintiff was promoted to "acting" Marketing Communications Manager, and later, received the title of Marketing Communications Manager, and supervised her former male peer, LeClairRyan still paid Plaintiff less than her male subordinate.

61. When LeClairRyan/ULX Partners "rebadged" Plaintiff to ULX Partners, LeClairRyan and ULX Partners continued to pay Plaintiff less than her male subordinate, further continuing the discriminatory pay scheme.

62. As a Marketing Communications Coordinator, Plaintiff's job functions were substantially similar to that of Brent Chargois, her male peer – and later, as Marketing Communications Manager - far exceeded the responsibilities of her male subordinate - in that her position shared a common core of marketing tasks requiring substantially equal skill, effort and responsibility.

63. As Marketing Communications Coordinator, Plaintiff's position from 2010 until her January, 2018 promotion to Marketing Communications Manager, she performed a wide range of marketing functions, including preparing responses to Requests for Proposals (RFPs) for the Firm across industries and practice areas, development and revision of all outward facing marketing copy for Firm practice areas, marketing brochures, external newsletter (including coordination of production with external design firms), review and proofing of client alerts and practice team newsletters for client "readability," editing power point presentations to standardize Firm brand and marketing standards and internal Firm communications, announcements, newsletters updating attorney profiles on the Firm website, as well as training new marketing coordinators.

64. Mr. Chargois was hired in February, 2016 when Plaintiff was out on FLMA leave to attend to her son's medical needs. Upon her return from FMLA leave, she resumed her former duties as Marketing Communications Coordinator, as outlined above.

65. As Marketing Communications Manager, Plaintiff supervised Mr. Chargois and four other marketing employees (her five direct reports; she also had one additional indirect report) who also received their departmental direction and training from Plaintiff. Her supervision included oversight of RFP responses, pitch books, business intelligence reports, and marketing and event materials. Plaintiff's oversight of Mr. Chargois and the other marketing

coordinators included review and approval of their time sheets in that she was familiar with all efforts of the Department and tasks performed by those under her supervision.

66. As Marketing Communications Manager, Plaintiff also had managerial responsibility over all Firm advertising, directing "message and tone" of written content and graphic design elements for marketing projects, managing Firm brand standards across all print and web-based internal and external content, liaison business development opportunities through AdvanceLaw (a collaboration of 200 corporate general counsels), management of all external and internal marketing communication programs, collaboration with the Firm HR department for diversity oriented marketing, maintenance of the Firm website, blogs and social media presence, collaboration with the onboarding department for integration of new Firm attorneys and preparation of attorney award nominations for legal industry recognition.

67. LeClairRyan and ULX Partners, by and through the actions of their agents and representatives, which were ratified and condoned, and the failures to act, have discriminated against Plaintiff in her compensation on the basis of her gender, in violation of the Equal Pay Act, 29 U.S.C. § 206(d), by paying Plaintiff at a lesser rate than that at which it pays wages to male employees for equal work on jobs the performance of which requires substantially equal skill, effort and responsibility and which are performed under similar working conditions.

68. Though centrally determined by senior Firm and ULX Partners management, the salary differentials were not administered in a systematic and uniform manner but rely on subjective impressions rather than objective job functions.

69. As a consequence of LeClairRyan's actions, and ULX Partner's actions, Plaintiff has suffered economic losses, including lost wages and other financial incidents and benefits of employment, and will continue to suffer such losses.

70. As a consequence of the acts and omissions of LeClairRyan, Plaintiff has incurred and will continue to incur attorneys' fees, costs and other incidental expenses.

71. Defendants' actions were willful or in conscious disregard of the law subjecting them to a third year of actual and liquidated damages pursuant to 29 U.S.C. § 206(d) *et seq.*, the Equal Pay Act.

**WHEREFORE,** Plaintiff Marci J. Keatts prays that judgment be entered in her favor and against LeClairRyan, a Professional Corporation and ULX Partners, jointly and severally; and requests in addition that this Court enter an Order, as follows:

(a) Declaring that the acts and practices complained of herein are in violation of Plaintiff's rights as secured by 42 U.S.C. § 2000e, *et seq.*, as amended ("Title VII"), as amended by the Lilly Ledbetter Fair Pay Act of 2009, and 29 U.S.C. § 206(d) *et seq.*, the Equal Pay Act;

(b) Issuing a permanent injunction enjoining Defendants LeClairRyan, PLLC and/or ULX Partners, LLC from continuing or maintaining a policy, practice or custom of denying, abridging, withholding or conditioning the rights of employees on the basis of gender, which rights are secured by 42 U.S.C. § 2000e-2(a), as amended and/or 29 U.S.C. § 206(d) *et seq.*, the Equal Pay Act;

(d) Awarding Plaintiff economic damages in the form of back pay, prejudgment interest, and other appropriate equitable relief for her lost employment benefits, and such other affirmative relief as may be appropriate, and for all other wages and benefits lost or denied, against Defendants, for violations of 42 U.S.C. § 2000e, as amended, including the Lilly Ledbetter Fair Pay Act;

(e) Awarding Plaintiff non-economic compensatory damages under 42 U.S.C. § 2000e, *et seq.*, against each Defendant, in an amount to be determined by the jury at trial but not less than $100,000 per Defendant;

(g) Awarding Plaintiff punitive damages under 42 U.S.C. § 2000e, *et seq.*, against each Defendant, in an amount to be determined by the jury at trial but not less than $100,000 per Defendant;

(i) Awarding Plaintiff actual wages damages and liquidated damages and other relief for violations of the Equal Pay Act, 29 U.S.C. §206(d), *et seq.* (EPA) against each Defendant;

(j) Awarding Plaintiff an additional third year of actual wage damages and liquidated damages and other relief for willful violations of the Equal Pay Act, 29 U.S.C. §206(d), *et seq.* (EPA) against each Defendant;

(k) Awarding Plaintiff a separate amount to offset the adverse tax effects of lump sum payments of damages and/or back or front pay by each Defendant;

(l) Awarding Plaintiff attorneys' fees and costs incurred in this action, together with expert witness fees and expenses, against each Defendant; and

(m) Ordering such other relief as this Court deems just and proper.

**TRIAL BY JURY IS DEMANDED**

    Respectfully Submitted,

    **MARCI J. KEATTS**

    By: __/s/__ *Harris D. Butler*
    Harris D. Butler, III (VSB No. 26483)

BUTLER ROYALS, PLC
140 Virginia Street, Suite 302
Richmond, Virginia 23219
(804) 648-4848 (telephone)
(804) 237-0413 (facsimile)
harris.butler@butlerroyals.com

*Counsel for Plaintiff*